# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Michael Dean Adkisson,

    Petitioner

v.

D.W. Neven,[1]  et al.,

    Respondents

Case No.:  2:14-cv-01934-APG-DJA

**Order Denying Petition, Denying Motion for Reconsideration, Denying Certificate of Appealability, and Closing Case**

[ECF Nos. 28, 126]

Michael Dean Adkisson filed a second-amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 28.  As discussed below, I deny the petition.

## I. Background

The State of Nevada charged Adkisson with murder with the use of a deadly weapon in connection with an incident between he and an acquaintance, Steven Borgens, in which Borgens ended up dead from a gunshot wound. Exhibit 7.[2]  On September 14, 2004, a jury found Adkisson guilty of second-degree murder with use of a deadly weapon. Exh. 30.  The state district court sentenced him to life with the possibility of parole after ten years, with an equal and consecutive term for the deadly weapon enhancement. Exh. 33.  Judgment of conviction was entered on December 27, 2004. Exh. 36.

The Supreme Court of Nevada affirmed Adkisson's convictions in May 2006, and denied his motion for rehearing in July 2006. Exhs. 46, 48.  Remittitur issued on August 8, 2006. Exh.

---

[1] According to the state corrections department's inmate locator page, Adkisson is incarcerated at Northern Nevada Correctional Center.  The department's website reflects that Nethanjah Breitenbach is the warden for that facility.  At the end of this order, I direct the clerk to substitute Nethanjah Breitenbach for prior respondent D.W. Neven under Federal Rule of Civil Procedure 25(d).

[2] The exhibits referenced in this order are Adkisson's exhibits and are found at ECF Nos. 17-21, 29, 89, 90, 95, 100, 111.

136.  In April 2015, the Supreme Court of Nevada affirmed the denial of Adkisson's counseled, state postconviction petition. Exh. 117.  That court denied a motion for rehearing in May 2015, and remittitur issued on June 25, 2015. Exhs. 118, 137.

While Adkisson's state postconviction petition was pending, he dispatched his federal habeas petition for filing on November 17, 2014. ECF No. 8.  This court appointed the Federal Public Defender (FPD) as counsel for Adkisson.  The respondents answered the claims in the second-amended petition. ECF No. 49.  Adkisson filed a reply through the FPD. ECF No. 60.  I granted Adkisson leave to file a supplemental reply. ECF Nos. 65, 68, 74.  Adkisson sought a stay of these federal proceedings while he returned to state court to litigate a claim regarding the validity of his deadly weapon enhancement sentence, which I granted in November 2019. ECF Nos. 82, 91.

In June 2021, the FPD filed a motion to re-open the case as well as a motion to withdraw as counsel. ECF Nos. 94, 96.  Counsel explained that he and Adkisson had a fundamental disagreement about how to proceed in the case and that there had been an irrevocable breakdown of the attorney-client relationship that resulted in an actual conflict of interest. ECF No. 96.  I granted both motions. ECF No. 99.  Adkisson moved to file a third-amended petition, which I denied. ECF No. 109, 122.  I now turn to the merits of his second-amended petition.

**II. Motion for Reconsideration**

As a preliminary matter, I denied Adkisson leave to file an amended petition in June 2022. ECF Nos. 109, 122.  The respondents had answered his second-amended petition in March 2017 (ECF No. 49), and I concluded that further amendment was futile because the claims Adkisson proposed to add were untimely, unexhausted, and procedurally barred. ECF No. 122. Adkisson moved to reconsider that order. ECF No. 126.  But Adkisson presents no bases for

reconsideration; he merely re-hashes the arguments that this court has rejected. *See, e.g.*, ECF Nos. 122, 123.  I therefore deny the motion.

### III. AEDPA Standard of Review

The standard of review generally applicable in habeas corpus cases is set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A state court decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254 "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrad*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 75 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's

application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

To the extent the petitioner challenges the state court's factual findings, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *See, e.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a mere showing that the state court finding was "clearly erroneous." *Lambert*, 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

## IV.  Relevant Trial Testimony

**Amy Jo Beach**

Amy Jo Beach testified that she was dating Steve Borgens, who had previously been married to her sister. Exh. 24 at 36-132.  They were both living at Alan Kofed's house at the time in question.  Beach was previously married to Patricia Colacino's brother.  Colacino was then living with her boyfriend, Adkisson.  Beach said she knew of no animosity between Adkisson and Borgens.

Beach recounted that on New Years' Eve 2003, Colacino and Adkisson had not been getting along, Adkisson had not been home in a while, and Beach told Colacino to come over and hang out with her, Borgens, and Kofed.  Colacino drank too much to drive, so Borgens drove her home in her car (owned by Colacino and Adkisson), and Beach rode in the back seat.  When Adkisson found out Borgens had driven his Mustang convertible, he began calling and harassing Beach, telling her she was a bitch and a whore who was with a convict.  He called her at all hours of the day and night, yelling at her that a convict drove his car.

In January 2004, Colacino called Beach and was very upset and wanted to move out.  Beach, Colacino's mom, and Stephanie Roundtree went to Colacino's apartment to help her get her things.  The apartment was "completely destroyed.  Everything turned upside down.  Her clothes in her room were cut up." *Id*. at 56.  Kofed told Colacino she could store belongings in his garage.  Colacino stayed with Kofed about three days then went to stay with her mother.  Colacino then told Beach that she was pregnant and wanted to reconcile with Adkisson.  She asked if she and Adkisson could come to Kofed's house to get her things.  Beach said that was ok but that she did not want any trouble.  The first time Adkisson went over to Kofed's was the first time Adkisson and Borgens met.  Beach observed no problems and no animosity or anger between the two.

Speakers that belonged to Colacino had ended up at Roundtree's house when Colacino moved.  Roundtree called Beach in a scared tone of voice and said Adkisson had called looking for the speakers.  Roundtree then brought the speakers to Kofed's house.  Beach said that during one of the many calls Adkisson made to harass her, Borgens grabbed the phone and told Adkisson, "if you don't stop, I'm gonna put something in you, and it ain't gonna be my dick either. *Id.* at 79.  That was the only time Beach ever heard Borgens threaten Adkisson.  Beach said she called Adkisson and told him to pick up the speakers on the day in question, February 18, 2004, or she was going to set them out for the garbage.  Adkisson was angry and called her profanities.

When Adkisson and Colacino called that evening and said they were entering the gated community, Beach told them she would have Borgens open the garage door so they could retrieve the speakers.  When the car pulled up, Borgens went out and opened the garage manually.  He stood shirtless by the open garage door.  Beach testified that he did not have a weapon and there were no weapons in the house.  Adkisson and Colacino got out and were standing near Beach's car; Adkisson looked very angry.  Kofed, who worked as a security guard for the gated community, had driven up and was trying to get Borgens to go inside and Adkisson to take the speakers and leave.  Adkisson had his right hand across his body and inside the left of his jacket.  Beach walked outside.  Kofed went in to call 911; Beach thought this was warranted after Adkisson's threats.  Adkisson's hands then went to his sides.  Beach saw a gun in his right hand.  She called out to Borgen's to watch out because of the gun.  Adkisson raised the gun and shot Borgens.  Borgens had never gone towards Adkisson or even moved.  Beach heard one gunshot.  Beach ran in to get a blanket and returned to Borgens.  Adkisson and Colacino had driven off toward the cul-de-sac, away from the entrance to the neighborhood.  The car then sped

back by, and Beach heard three gunshots.  She turned around to see it was Kofed who had been

shooting.  He obtained the gun from a neighbor who had come out to see what was happening.

On cross-examination, Beach acknowledged that in two different interviews she did not

tell police about the specific profanities Adkisson would call her.  She also agreed that she was

proud that Borgens was a "tough guy" and would tell people that. *Id*. at 123.

**Eddie Beach**

Ten-year-old Eddie Beach was Amy Beach's son.  He testified that was living with her at

Kofed's house. Exh. 25 at 158-180.  On the night in question, Eddie and Borgens were playing

inside the house with action figures.  Borgens went out to the garage.  Eddie poked his head out

of the door and saw Colacino (his aunt) and Adkisson get out of their car.  Borgens had his hands

up on the open garage door.  Eddie did not see anything in his hands.  Adkisson was holding his

right arm inside his shirt, across his body against his left breast.  Borgens and Adkisson started

yelling at each other.  Kofed went between them and told Borgens to go inside.  Kofed went

inside and got the cordless phone.  Eddie heard a gunshot and looked out and saw Borgens on the

ground.

**Alan Kofed**

Alan Kofed testified that he rented a house in a gated community, Borgens and Beach

were his roommates, and Beach's son also lived with them. Exh. 25 at 63-141.  He knew Beach,

Colacino, and Roundtree because they had all worked at the same casino.  He worked as a

security guard for the community and was working on the night in question.

Adkisson and Colacino drove up to the gate; Kofed had not known they were coming.

Adkisson's demeanor was angry, and he told Kofed that he did not know how Kofed could let a

two-time felon live in his house.  Adkisson also told Kofed that Borgens had threatened him with

a knife.  They drove off to Kofed's house, and Kofed followed them in his security truck.  He

parked in his driveway and saw Borgens standing without a shirt on in the open garage with his hands on the garage door.  Beach and her son were inside the house.  Adkisson was walking up the driveway and had his right arm across his body and underneath his jacket around the belt line area.  Kofed asked Borgens to go back into the house and turned around to tell Adkisson that he did not want any trouble when he saw that Adkisson was holding a handgun.  Kofed never saw Borgens push Colacino.  Kofed went inside to call 911.

Kofed walked back into the garage with the cordless phone.  He heard the gun go off and saw the flash.  Adkisson and Colacino ran back to their car.  Borgens slumped over and fell to the ground.  Kofed did not see any weapons on Borgens or in his hands.  Kofed acknowledged that he told the 911 dispatcher that shots were fired, though he only heard one.  Adkisson drove off in the opposite direction of the community's exit.  There were no guns in Kofed's house at the time.  Kofed went out in the street.  His neighbor Nason Schoeffler came out; Kofed asked him if he had his gun.  He grabbed Schoeffler's gun, moved closer to a vehicle for cover and fired two shots at the Mustang when Adkisson and Colacino drove back by.  When paramedics arrived, Borgens was dead.  That night when homicide detectives interviewed Kofed he did not tell them that he had shot at the car.  Days later, homicide detectives interviewed him again, and he told them he had fired twice at the car.

**Stephanie Roundtree**

Roundtree testified that she was a friend of Beach's and Colacino's. Exh. 25 at 5-23.  She and Beach and Colacino's mother went to Colacino's and Adkisson's apartment to help Colacino move out because she was having difficulties with Adkisson.  Roundtree said the apartment was "trashed." *Id*. at 11.  She loaded the speakers and other belongings into her SUV.  She brought most of the items to Kofed's house, but kept the speakers.  Colacino called her and left her a message that she wanted the speakers.  Roundtree called her back but missed her.  Adkisson

8

1  called Roundtree, he was argumentative and said something to her that made her fear for the

2  safety of her and her children.  Roundtree brought the speakers over to Kofed's.  Roundtree

3  acknowledged on cross-examination that during her interview with a homicide detective, she

4  never said that she was afraid of Adkisson or feared for the safety of her kids.

5  **Patricia Colacino**

6  Adkisson's girlfriend Patricia Colacino testified that after Roundtree dropped the

7  speakers at Kofed's Amy Beach repeatedly called Adkisson, swearing at him to come get the

8  speakers. Exh. 27 at 95-175.  Beach put Borgens on the phone, and he said he was "going to

9  stick something in [Adkisson], and it wasn't gonna be his dick." *Id*. at 106.

10  On the night in question, she and Adkisson drove to Kofed's house.  They first spoke

11  with Kofed, who was parked in his truck working in the community.  Colacino reminded Kofed

12  that she had told him that Borgens was threatening Adkisson.  Colacino called Beach, Borgens

13  answered, and she told him they were almost at the house.  They pulled up at the house and

14  Adkisson opened the trunk.  Colacino walked up the driveway; Adkisson walked up behind her.

15  Borgens was standing in the garage without his shirt.  Colacino thought he looked ready to fight.

16  Borgens told Adkisson that he was dead, no matter what, that Borgens' gang affiliates would

17  take care of him.  Borgens then pushed Colacino, who fell back into Adkisson.  Colacino saw

18  Beach in the doorway and asked her to tell Borgens to go inside so they could just get the

19  speakers and leave.  Beach started mouthing to Colacino, "What's the matter, can't your man

20  take care of himself? Mine can take care of himself." *Id*. at 118.

21  Kofed walked up, put his hand on Borgens' shoulder, and told him to calm down.

22  Borgens shrugged him off and then pushed Colacino off to the side.  She heard a gunshot, then

23  Adkisson grabbed her arm and said let's go.  They ran to the car.  Colacino heard a couple more

24  gunshots.  They made a U-turn, and when they drove by again there were four more gunshots.

1  She heard six or seven gunshots total.  She did not see where the shots came from and was

2  terrified because her ten-year-old son was in the backseat.

3       Soon after they drove out of the gated community, a police car pulled up behind them and

4  turned the lights on.  Within seconds, four to six more police cars pulled up.  Colacino called

5  Adkisson's mom.  The police had guns drawn and were yelling for them to exit the vehicle.

6  Colacino rolled down the window, screaming at them not to shoot because her son was in the

7  car.  Colacino then got out and so did her son.  Adkisson did not exit right away because he was

8  talking to his mom on the phone.  Colacino never saw a gun on Adkisson.  She learned later from

9  police that Adkisson had a gun.

10      Colacino said that in the weeks leading up to the incident, Beach would call and yell at

11 her and Adkisson, saying that Borgens can kick Adkisson's ass.  Colacino acknowledged that the

12 time that she moved her belongings out she and Adkisson had had a disagreement, but she

13 insisted she moved items out because someone had broken into their apartment and trashed it.

14 Colacino's mom, Roundtree, and Beach helped her move some things; Roundtree took the

15 speakers without asking.  Colacino agreed on cross-examination that she never told police that

16 Borgens told Adkisson that his gang affiliates would take care of him, nor did she put it in her

17 handwritten statement to police.  Colacino said that when they got in the car after the shots were

18 fired, she said, "what the hell just happened?" and Adkisson replied that "he drew a gun." *Id*. at

19 154.  She said she did not know if "he" referred to Borgens or Kofed.  Adkisson also said that he

20 (Adkisson) was going to jail. *Id*. at 156.  Colacino never saw any type of weapon on Borgens.

21      **Andre Carter**

22      LVMPD officer Andre Carter testified that on the night in question he received a call

23 from dispatch about a Mustang with an armed person inside. Exh. 24 at 165-176.  He saw the car

24 and began following it.  He could see two occupants.  The car drove into a cul-de-sac and then

into a driveway.  After another officer arrived, the two officers took cover near the Mustang. Colacino and her son got out, and officers walked them away from the vehicle to interview them. By then 10-15 officers had arrived.  Officer Chad Baker made contact with Adkisson; three or four other officers were with him with guns drawn.  Carter said that about 35-40 minutes passed between when the car pulled into the cul-de-sac and the time Adkisson was taken into custody.

**Chad Baker**

Officer Baker testified that he responded to the scene and saw Adkisson in the Mustang in the cul-de-sac. Exh. 24 at 177-213.  He took cover behind a large tree.  Adkisson was revving the engine.  Baker commanded him several times to turn off the engine and exit the vehicle.  He saw Colacino in the car.  She was yelling for the police to leave them alone, saying that the police would shoot Adkisson if they got out.  Baker tried to persuade her to get out of the car. Adkisson raced the car forward 15-20 feet; he yelled for the police to move their vehicles out of his way.  Baker was able to take cover closer to the Mustang where he could maintain eye contact with Adkisson.  He repeatedly told him to turn off and exit the vehicle.  Adkisson was yelling "I'm not going to get out. You're gonna shoot me."  Colacino was also yelling at Adkisson not to get out.  Then Baker saw the boy in the back seat.

After Baker told her several times, Colacino took the boy and they both moved away from the car.  Adkisson still refused to get out and told Baker he was going to start running over officers.  Adkisson told Baker he had a gun at his feet.  Baker persuaded Adkisson to open his car door.  Baker estimated that 25-30 minutes had passed since he entered the cul-de-sac. Eventually, Baker was able to tase Adkisson and take him into custody.

**Josephine Leu**

Josephine Leu testified that Colacino was her daughter and Amy Beach was her daughter-in-law. Exh. 28 at 36-52.  She said that in January 2004, Amy told her that Borgens

1  "knew people that could take care of [Adkisson]." *Id*. at 38.  Sometime the first week of

2  February, Amy told Leu that no matter what happened between Colacino and Adkisson, Borgens

3  was not going to let the situation drop.  Shortly after Borgens was killed, Amy came to the

4  McDonald's where Leu worked and told her that the next time she saw Colacino she would be

5  dead.

6        **V. Claims of Ineffective Assistance of Counsel**

7        In ground 1 of the second-amended petition Adkisson asserts six claims that his trial

8  counsel rendered ineffective assistance. ECF No. 28 at 16-30.  Federal courts address ineffective

9  assistance of counsel (IAC) claims under the two-part test announced in *Strickland v.*

10 *Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court held that a petitioner

11 claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney

12 "made errors so serious that he or she was not functioning as the 'counsel' guaranteed . . . by the

13 Sixth Amendment," and (2) "that the deficient performance prejudiced the defense." *Williams*,

14 529 U.S. at 3991 (quoting *Strickland*, 466 U.S. at 687)).  To establish ineffectiveness, the

15 defendant must show that counsel's representation fell below an objective standard of

16 reasonableness. *Id*. at 391 (citation and internal quotation marks omitted).  To establish

17 prejudice, the defendant must show that there is a reasonable probability that, but for counsel's

18 unprofessional errors, the result of the proceeding would have been different. *Id*. (citation and

19 internal quotation marks omitted).  A reasonable probability is "probability sufficient to

20 undermine confidence in the outcome." *Id*. (citation and internal quotation marks omitted).

21 Additionally, any review of the attorney's performance must be "highly deferential" and must

22 adopt "counsel's perspective at the time" of the challenged conduct to avoid "the distorting

23 effects of hindsight." *Strickland*, 466 U.S. at 689.  It is the petitioner's burden to overcome the

24 presumption that counsel's actions might be considered sound trial strategy. *Id*.

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotation marks and citations omitted).  There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).

If the state court has already rejected an IAC claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *Yarborough*, 540 U.S. at 5.  The Supreme Court of the United States has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  The Supreme Court emphasized that: "We take a highly deferential look at counsel's performance . . . through the deferential lens of § 2254(d)." *Id*. (citations and internal quotation marks omitted).  Moreover, federal habeas review of an IAC claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*. at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

1    *Harrington*, 562 U.S. at 105.  "A court considering a claim of ineffective assistance of counsel

2    must apply a strong presumption that counsel's representation was within the 'wide range' of

3    reasonable professional assistance." *Id*. at 104 (citations and internal quotation marks omitted).

4    "The question is whether an attorney's representation amounted to incompetence under

5    prevailing professional norms, not whether it deviated from best practices or most common

6    custom." *Id*. (internal quotation marks and citations omitted).

7        **Ground 1(a)-(c)**

8        Adkisson contends that trial counsel was ineffective for failing to hire a crime scene

9    expert to testify regarding law enforcement's failure to collect shell casings at the scene and

10   other deficiencies in their investigation (Ground 1(a)), failing to interview eye and ear witnesses

11   (Ground 1(b)), and failing to have the 911 recording provided in discovery analyzed by an expert

12   (Ground 1(c)). ECF No. 28 at 16-26.

13       At the state postconviction evidentiary hearing, Adkisson's trial counsel Robert

14   Draskovich testified that he listened many times to the 911 call and found it disconcerting

15   because it supported the State's theory of the case. Exh. 94 at 4-27.  Adkisson was adamant that

16   Kofed had gotten the gun he shot at Adkisson's car with from Borgens' body.  But the recording

17   revealed that the neighbor had come out, there was a conversation between Kofed and the

18   neighbor, and when the neighbor handed Kofed the gun Kofed asked "Is it loaded?" *Id*. at 9.

19   Counsel testified that it would not have been in Adkisson's best interest to have the call analyzed

20   by an expert because it contradicted the defense theory.  Kofed and the neighbor both testified,

21   and Draskovich did not want to have an expert confirm their testimony.

22       Draskovich also pointed out in the first part of the call someone is screaming and crying

23   and it is clear Kofed is near Borgens.  But the crying grows more distant, indicating Kofed was

24   walking away.  There then is a conversation with someone else about whether a gun is loaded.

The 911 call thus corroborated Kofed's and the neighbor's testimony.  He testified that if there had been a witness identified that had exculpatory evidence, the defense would have called that witness.  He said as a general matter that he does not rely on the State's investigation but conducts his own.  In this case, he had an independent investigator who talked to neighbors.

The Supreme Court of Nevada addressed these claims together, holding that the record did not support the claim that counsel failed to properly investigate and analyze the 911 call or interview neighborhood witnesses:

> First, Adkisson argued that trial counsel provided ineffective assistance by failing to adequately investigate prior to trial, specifically asserting that counsel should have obtained expert analysis of the 911 call recording and should have interviewed people living near the crime scene to corroborate his self-defense theory.  An attorney must reasonably investigate in preparing for trial or reasonably decide not to. *Strickland*, 466 U.S. at 691; *Kirksey*, 112 Nev. at 992, 923 P.2d at 1110.  Trial counsel testified that he did not enlist an expert because the 911 recording supported the State's narrative and not the defense's self-defense theory and he did not want to strengthen evidence that favored the State.  Adkisson's assertion that analyzing the recording would undermine Alan Kofed's testimony lacks support in the record.  Regarding neighbor interviews, trial counsel testified that he used an investigator who canvassed the neighborhood, and Adkisson failed to show that neighbor testimony would have supported the defense theory and led to a reasonable probability of a different outcome. *See Strickland*, 466 U.S. at 687-88. 1.

Exh. 117 at 3-4.

Kofed acknowledged at trial that he did not tell the police that night that he had shot at the Mustang.  But he testified in detail that Schoeffler, the neighbor across the street, came out with a gun (that he had previously purchased from Kofed), handed Kofed the gun, and Kofed shot at the Mustang when it drove by.  Schoeffler testified to the same.  Adkisson offered no evidence to support his contention that there was some defect in Kofed's gun registrations—presumably he was trying to dispute Kofed's testimony that he did not own firearms at the time—but any such evidence would not have challenged any of the eyewitness testimony in a meaningful or impactful way.  The 911 call did not support Adkisson's version of events and

15

counsel cannot have been ineffective for failing to secure an expert that would further support the State's theory of the case.  Adkisson has not demonstrated a reasonable probability of a different outcome at trial.  He has failed to demonstrate that the Supreme Court of Nevada's decision was contrary to, or involved an unreasonable application of, *Strickland*. *See* 28 U.S.C. § 2254(d).  Accordingly federal habeas relief is denied as to grounds 1(a), 1(b) and 1(c).

**Ground 1(d)**

Adkisson asserts that trial counsel was ineffective for failing to request a spoliation of evidence instruction regarding the shell casings and gun the police failed to preserve. ECF No. 28 at 26-28.

At trial, Sergeant Kevin Manning testified that he was a LVMPD homicide detective. Exh. 27 at 55-84.  He said initially police thought only one weapon was involved.  They saw two shell casings across the street from Kofed's house, but initially thought they were unrelated.  The early information they had was that a revolver had been used, and revolvers do not kick out expended shell casings.  When Manning heard the recording of the 911 call in which Kofed references having a gun, police conducted second interviews with Beach and Kofed.  The police then learned that Kofed had fired on the Mustang.  On cross-examination Manning acknowledged that police never searched Kofed's house or the cars parked in his driveway.

LVMPD Detective Mike Wallace testified at trial that he responded to the scene subsequent to Borgen's shooting where Adkisson had pulled into a different cul-de-sac and then into a driveway and refused to exit the vehicle. Exh. 28 at 53-71.  He said that the next day Adkisson and Colacino contacted him to say that they forgot to tell him that they had been fired on four times when they drove by Kofed's house trying to exit the gated community.  They said that the shots seemed to originate from two or three houses down from Kofed's, but they could not tell precisely.  On cross-examination, Draskovich highlighted that Kofed did not tell police

he had fired on the vehicle; they first learned that information from Colacino and Adkisson.
Wallace acknowledged that he did not look for or collect shell casings at the homicide scene and
that in fact he had never been to the scene.  He agreed no tests were performed on any guns
involved and that he learned that shell casings were discovered at the scene from other officers.

LVMPD senior crime scene analyst Jeff Smink testified that he was dispatched to the
homicide scene that night. Exh. 25 at 24-45.  He gathered evidence and took photographs.  The
police team located the shell casings in the street that night but did not think they were of
evidentiary value because their information then was that the homicide involved only one
firearm and one shot, in the driveway.  The shell casings were not impounded.  Smink himself
never saw the shell casings.

The defense offered this instruction, which was given:

Jury Instruction No. 32:

> You have heard evidence of the availability to the prosecution of certain tests and
> that such tests were not preformed.  In considering the question of whether the
> prosecution has proved its case against the defendant beyond a reasonable doubt,
> you may consider whether and how the performance of such tests would have
> assisted you in determining whether or not the defendant is guilty.  I further
> instruct you that while you may not speculate on this or any other issue in this
> trial, the adequacy of tests performed and the failure to perform available tests are
> matters for your consideration.

Exh. 29 at 33.

The Supreme Court of Nevada held that counsel was not ineffective regarding alleged
evidence spoliation:

> Trial counsel raised this issue extensively in cross-examining police investigators
> and made this a prominent theme in arguing that the State failed to meet its
> burden.  Trial counsel successfully proposed a jury instruction permitting the jury
> to consider whether certain tests that the police declined to perform would have
> been useful in determining guilt.  Further, possession of the evidence that was not
> collected would not likely benefit Adkisson's defense theory: the spent cartridge
> casings were found on the other side of the street and do not support self-defense,
> Kofed admitted to firing the handgun in question at the fleeing Adkisson's car,

and Adkisson's assertion that the decedent fired the handgun was not supported by any evidence and conflicts with overwhelming evidence at trial.  Adkisson did not show that trial counsel was deficient on this issue or that he was prejudiced by the loss of this evidence. *See Strickland*, 466 U.S. at 687-88, 691; *Daniels v. State*, 114 Nev. 261, 267, 956 P.2d 111, 115 (1998).

Exh. 117 at 5-6.

Adkisson argued that he shot Borgens in self-defense.  Kofed, while not candid with the police on the night of the murder, testified at trial that he shot at the Mustang four times with a gun his neighbor handed him in the street as it left the scene.  That neighbor testified similarly.  Colacino testified that their car was fired on four times as they drove away.  It was undisputed that Borgens was shot once, higher up in the driveway, closer to the garage.  Adkisson's argument that the shell casings in the street would have benefited his self-defense theory is belied by the record.  Yet defense counsel still cross-examined the police investigators and sought to highlight the lack of investigation of the casings and lack of testing of the guns.  The jury was also instructed that they could consider the adequacy of the testing and investigation as it related to the State's burden.

Adkisson has failed to demonstrate a reasonable probability of a different outcome at trial if the evidence had been collected.  He has not shown that the Supreme Court of Nevada's decision was contrary to, or involved an unreasonable application of, *Strickland*. *See* 28 U.S.C. § 2254(d).  Accordingly federal habeas relief is denied as to ground 1(d).

**Ground 1(e)**

Adkisson claims that his counsel advised him not to testify in part because his criminal record would be used against him. ECF No. 28 at 28-29.  He argues that this was ineffective assistance because he only had three misdemeanor convictions at the time of trial, which cannot be used for impeachment under Nevada law.

At the state postconviction evidentiary hearing, defense counsel recalled that Adkisson did not want to testify. Exh. 94 at 4-27. Draskovich said he would never prevent a defendant from testifying. He noted that after the shooting, during the standoff with police, Adkisson was tased, and those events were recorded and presented to the jury. Thus, he thought it probably was not a good tactic for Adkisson to testify, but he would not have prevented it as Adkisson was the one on trial. He remembered discussing with Adkisson that if he testified the police never told him to get out of the car, which was contradicted by the tape the jury saw, that would damage his credibility. He also noted that the judge canvassed Adkisson at trial, and he confirmed that he did not wish to testify. Draskovich testified that he had consulted a mental health expert to possibly testify about fight or flight syndrome, but that that theory was not viable because Adkisson arrived at the house armed.

The trial judge canvassed Adkisson as to his decision regarding testifying. Exh. 27 at 86-89. The judge explained the constitutional right not to testify at some length in response to Adkisson saying he understood his right "for the most part." *Id*. at 86. After further explanation, Adkisson said that he fully understood and had no further questions. After a break, Adkisson confirmed to the court that he did not wish to testify.

Rejecting this claim, the Supreme Court of Nevada credited defense counsel's strategy in advising Adkisson whether to testify:

> Adkisson argued that trial counsel provided ineffective assistance by improperly advising Adkisson not to testify at trial. He failed to demonstrate that his counsel's performance was deficient or that he was prejudiced. The evidentiary hearing transcript showed that counsel's reasons for advising Adkisson not to testify stemmed from concern that his testimony would damage the defense's case. The district court thoroughly canvassed Adkisson on his right to testify and informed him that the decision to testify was his alone, and he declined to do so. Trial counsel was not ineffective on this basis.

Exh. 117 at 6.

Defense counsel testified that he advised Adkisson not to testify because in his view the eyewitnesses, 911 call, and the recording of Adkisson's arrest by police contradicted Adkisson's version of events. Draskovich also stated that Adkisson was a difficult client, and he worried that Adkisson might clash with prosecutors or even the judge while on the stand, which would be unlikely to be viewed favorably by the jury. Adkisson has not shown a reasonable probability of a different outcome at trial if he had taken the stand. He has not demonstrated that the Supreme Court of Nevada's decision was contrary to, or involved an unreasonable application of, *Strickland*. *See* 28 U.S.C. § 2254(d). The court denies federal habeas relief on ground 1(e).

**Ground 1(f)**

Adkisson insists that trial counsel was ineffective for failing to inform the prosecutor that Adkisson had accepted a mid-trial plea offer. ECF No. 28 at 29-30.

Defense counsel Draskovich testified about plea negotiations at the state postconviction evidentiary hearing. Exh. 94 at 4-27. He reported that throughout the trial he tried to secure a plea deal: "there was [sic] heavy discussions of negotiations throughout the entirety of my representation . . . . up until the return of the verdict." *Id.* at 6. He said he always tells every client of any plea offers. There was never an offer that Adkisson accepted. The State never offered anything better than second-degree murder with use of a deadly weapon, which at the time carried sentences of 10 years to life with a consecutive term of 10 years to life. He distinctly recalled repeatedly pursuing a plea deal for manslaughter with use of a deadly weapon—a term of 8 to 20 years—throughout trial. He was certain the State never offered a deal for 1 to 4 years. He had a clear recollection of the case because Adkisson was a difficult client. He also remembered that he urged the prosecutor, who was on crutches during trial, to enter a plea deal so he could go home and rest his leg. He testified:

> A: Yes, and, as I recall, you were on crutches. You had broken your leg or your foot during this thing, and I kept goin': Let's just get this case negotiated. Give

me an 8 to 20 manslaughter, with use, we'll stipulate and go home, and nurse your foot.

Q: Yep. You're right.

*Id*. at 26.

The Supreme Court of Nevada held that Adkisson did not show a plea offer existed or that he accepted a plea offer:

> Adkisson argued that trial counsel failed to convey a plea offer.  During the evidentiary hearing, trial counsel discussed his extensive plea negotiations with the State and how no plea offer was made, and the prosecutor had a similar recollection of the proceedings.  The district court found trial counsel to be credible and that no offer was made. *See Lader*, 121 Nev. at 686, 120 P.3d at 1166.  The record confirms that the defense requested an offer but does not show that a formal offer ever arose from these requests, and no evidence supported Adkisson's allegations that a plea offer existed or that he accepted a plea offer.  Adkisson failed to show that counsel's performance was deficient. *See Strickland*, 466 U.S. at 688.

Exh. 117 at 7.

Defense counsel testified credibly and with specificity at the state postconviction hearing that he pursued plea negotiations before and throughout trial, including right up to the verdict. Adkisson apparently made a bare claim on state postconviction review that he had agreed to a deal of 1 to 4 years.  That assertion strains credulity based on the evidence presented at trial.  The record supports defense counsel's testimony that he repeatedly sought a plea deal throughout the case.  Adkisson has not presented evidence that his counsel failed to convey a plea offer.  He has not demonstrated that the Supreme Court of Nevada's decision was contrary to, or involved an unreasonable application of, *Strickland*. *See* 28 U.S.C. § 2254(d).  I therefore deny federal habeas relief on ground 1(f).

/ / / /

/ / / /

21

**VI. Claims Rejected on Direct Appeal**

**Ground 2**

Adkisson alleges that the trial court erroneously admitted highly prejudicial evidence suggesting that he had a standoff with police after the shooting in violation of his Fifth, Sixth, and Fourteenth Amendment due process and fair trial rights. ECF No. 28 at 30-33.

As recounted above, Metro Officer Baker testified in detail about how Adkisson refused to obey commands to get out of his car. Adkisson acknowledged he had a gun in the car and threatened to run over officers. The standoff lasted more than 30 minutes.

In Nevada, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." NRS 48.015. Under state law "[c]onduct occurring after a crime may be relevant to proving the commission of the crime," and may be admissible even if the conduct itself is criminal. *Garner v. State*, 6 P.3d 1013, 1020 (Nev. 2000), overruled on other grounds by *Sharma v. State*, 56 P.3d 868 (Nev. 2002); *Reese v. State*, 595 P.2d 212, 215 (Nev. 1979).

The Supreme Court of Nevada held that the evidence was properly admitted:

"A district court's ruling on a motion in limine is reviewed for an abuse of discretion."[FN5] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."[FN6] "Conduct occurring after a crime may be relevant to proving the commission of the crime."[FN7] "The conduct of an accused which shows consciousness of guilt is admissible, even though it may in itself be criminal."[FN8]

We conclude that the evidence concerning Adkisson immediately leaving the scene of the shooting and subsequently engaging in a standoff with police was relevant because it demonstrated Adkisson's consciousness of guilt. Such conduct makes it less probable that Adkisson shot Borgens out of self-defense since, generally, someone would not flee the scene and then threaten their own life as well as the lives of law enforcement if they had just shot someone in self-defense. As a result, we conclude that the district court did not abuse its discretion in denying Adkisson's motion in limine.[FN9]

[FN5: *Whisler v. State*, 121 Nev. __, __,116 P.3d 59, 62-63 (2005).]

[FN6: NRS 48.015.]

[FN7: *Garner v. State*, 116 Nev. 770, 780, 6 P.3d 1013, 1020 (2000) (overruled on separate grounds by *Sharma v. State*, 118 Nev. 648, 56 P.3d 868 (2002)).]

[FN8: *Reese v. State*, 95 Nev. 419, 423, 596 P.2d 212, 215 (1979).]

[FN9: We have also considered Adkisson's arguments that such evidence was improper res gestae evidence and/or improper character evidence. We conclude that both of these arguments similarly lack merit.]

Exh. 46 at 5-6.

Adkisson ran to his car and sped off after shooting Borgens.  He then refused police commands to exit his car for about 30 minutes.  The Supreme Court of Nevada's holding that his actions demonstrated consciousness of guilt because generally one would not flee after shooting someone in self-defense then engage in a standoff with police is a common-sense, reasonable conclusion.  The evidence was relevant and cut against Adkisson's self-defense theory.  The admission of the evidence did not violate Adkisson's federal fair trial or due process rights. Adkisson has failed to demonstrate that the Supreme Court of Nevada's decision was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  I therefore deny federal habeas relief as to ground 2.

**Ground 3**

Adkisson contends that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial, due process, and to be proven guilty beyond a reasonable doubt when it improperly instructed the jury that Adkisson's supposed flight was evidence of guilt. ECF No. 28 at 33-35.  The jury was instructed:

> The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence.  Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to such a circumstance are matters for your deliberation.

Jury Instruction No. 31, Exh. 29 at 32.

The Supreme Court of Nevada held that the trial court did not abuse its discretion in giving the flight instruction:

> A district court has broad discretion in settling jury instructions which will not be disturbed on appeal absent an abuse of discretion or judicial error.[FN10]  Flight instructions are proper where evidence of flight has been presented.[FN11]  Leaving the scene of a crime does not, in and of itself, constitute flight.[FN12]  Rather, flight "embodies the idea of going away with a consciousness of guilt and for the purpose of avoiding arrest."[FN13]
>
> We conclude that the jury instruction on flight was not an abuse of discretion because evidence of flight was presented which indicated a consciousness of guilt and a desire to avoid apprehension.  Testimony at trial established that, after shooting a shirtless Borgens, Adkisson and [Colacino] ran back to their car and sped off.  Before they were able to drive out of the gated community, a police officer pulled Adkisson over.  Adkisson then refused to exit his vehicle and, as more officers arrived on the scene, revved his engine while yelling that he was going to "start running over officers."  Adkisson also threatened to take his own life.  Thus, the evidence demonstrated more than Adkisson merely leaving the scene; it embodied a consciousness of guilt and a desire to avoid arrest.  As such, it was within the district court's discretion to issue a jury instruction on flight.
>
> [FN10: *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001).]
>
> [FN11: *Potter v. State*, 96 Nev. 875, 875-76, 619 P.2d 1222, 1222 (1980).]
>
> [FN12: *Id*. at 876, 619 P.2d at 1222.]

24

1    [FN13: *Id.*]

2 Exh. 46 at 6-7.

3        Colacino had testified that immediately after the victim was shot, Adkisson "grabbed

4 [her] arm and told [her] let's get in the car" and they "ran to the car." Exh. 27 at 123.  She also

5 testified that when the police were following the Mustang, Adkisson blurted out that "he's going

6 to jail." *Id*. at 156. All of the eyewitnesses said that Colacino and Adkisson ran to their car, got

7 in, and sped off in the wrong direction.  Several police officers testified with specificity about

8 trying to get Adkisson to exit his vehicle for more than 30 minutes.  Further, the instruction also

9 stated that whether any evidence of flight indicates consciousness of guilt is for the jury to

10 determine.  Adkisson has not shown that the Supreme Court of Nevada's decision was contrary

11 to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or

12 was based on an unreasonable determination of the facts in light of the evidence presented in the

13 state court proceeding. 28 U.S.C. § 2254(d).  Federal ground 3 is denied.

14        **Ground 4**

15        Adkisson argues that the trial court improperly admitted irrelevant and highly prejudicial

16 character evidence suggesting he mistreated women and that two of the State's witnesses were

17 afraid of him in violation of his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial, due

18 process and to be proven guilty beyond a reasonable doubt. ECF No. 28 at 35-39.  The Supreme

19 Court of Nevada disagreed that the evidence was irrelevant or improperly admitted:

20        Adkisson made several menacing telephone calls to Beach during which he called
         her derogatory names, ridiculed her for dating an ex-felon, and demanded that the
21       stereo speakers be returned.  During one of these telephone calls, Borgens and
         Adkisson exchanged threats.  Adkisson also made an intimidating telephone call
22       to Roundtree after learning that she possessed the stereo speakers. At trial, both
         Beach and Roundtree testified as to those telephone calls.  Adkisson argues that
23       this evidence was improper character evidence.

24        Absent manifest error, this court will give great deference to a trial court's
         decision to admit evidence of prior bad acts.[FN1]  Pursuant to NRS 48.045(1),

25

"[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion."  "However, evidence of other wrongs may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident."[FN2]

Adkisson failed to object to both Beach's and Roundtree's testimony concerning the telephone calls they received from Adkisson.[FN3]  Regardless, such evidence does not constitute plain error because both Beach's and Roundtree's testimony concerning the telephone calls was admissible pursuant to NRS 48.045(2).  The telephone calls demonstrated Adkisson's motive and intent; both of which are admissible prior bad acts.  On the night Adkisson went to retrieve the speakers, Adkisson claims he shot and killed Borgens out of self-defense.  Beach's and Roundtree's testimony served to negate Adkisson's claim by showing that Adkisson disliked Beach and her relationship with Borgens and was both angry and aggressive about getting the speakers back.  Thus, the admission of such testimony did not result in plain error and did not prejudice Adkisson's substantial rights.[FN4]

[FN1: *Braunstein v. State*, 118 Nev. 68, 72, 40 P.3d 413, 416 (2002).]

[FN2: *Qualls v. State*, 114 Nev. 900, 902, 961 P.2d 765, 766 (1998) (citing NRS 48.045(2)).]

[FN3: *Allred v. State*, 120 Nev. 410, 418, 92 P.3d 1246, 1252 (2004) ("Failure to object to an issue at trial will generally preclude appellate review of that issue unless there is plain error.").]

[FN4: We have considered Adkisson's arguments that Beach's and Roundtree's testimony concerning the condition of his apartment was improper character evidence and relieved the State of its burden of proof, and find them to be without merit.]

Exh. 46 at 3-5.

As set forth above, Beach testified at length about events leading up to the shooting—that after she helped Colacino move out Adkisson would call her yelling, threatening, and swearing at her that he wanted the speakers back.  Stephanie Roundtree testified that she took the speakers to her home when she helped Colacino move her things, and that Adkisson called and threatened her in such a manner that she feared for her safety and that of her kids and brought the speakers over to Beach to wash her hands of the situation.  Adkisson characterizes the testimony as

1    evidence that he had previously mistreated women.  But the angry exchanges with Adkisson

2    were part of the series of events that led up to Adkisson and Colacino going to Kofed's house

3    and ultimately the shooting.  It also explained the animosity between Borgens and Adkisson.

4    The women's testimony was admissible for purposes including Adkisson's motive and intent.

5         Adkisson is not entitled to habeas relief on ground 4 because he has not shown that the

6    Supreme Court of Nevada's decision was contrary to, or involved an unreasonable application

7    of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination

8    of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

9    Accordingly federal ground 4 is denied.

10        **Ground 5**

11        Adkisson argues that the prosecutor engaged in misconduct that violated his Fifth, Sixth,

12   and Fourteenth Amendment rights to a fair trial, due process, to present a defense, and to be

13   proven guilty beyond a reasonable doubt. ECF No. 28 at 40-43.

14        A prosecutor's actions constitute misconduct if they "so infected the trial with unfairness

15   as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S.

16   168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S.

17   637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).  The "appropriate standard of review for such a

18   claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of

19   supervisory power.'" *Id*. (quoting *Donnelly*, 416 U.S. at 642, 94 S.Ct. 1868).  On habeas review,

20   constitutional errors of the "trial type," including prosecutorial misconduct, warrant relief only if

21   they "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*

22   *v. Abrahamson*, 507 U.S. 619, 637–38, (1993) (internal quotation marks omitted).

23   / / / /

24   / / / /

**Ground 5(a)**

Adkisson claims that the prosecutor misstated the law of self-defense. ECF No. 28 at 40-42.  The trial judge instructed the jury:

> The right of self-defense is not available to an original aggressor, that is a person who has sought a quarrel with the design to force a deadly issue and thus through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault.
>
> Where a person without voluntarily seeking, provoking, inviting, or willingly engaging in a difficulty of his own free will, is attacked by an assailant, he has the right to stand his ground and need not retreat when faced with the threat of deadly force.

Exh. 29 at 31, jury instruction no. 30.  In closing, the prosecutor argued that Adkisson's claim of self-defense was unpersuasive:

> [S]elf-defense is not available to an original aggressor. . . . And he cannot become the original aggressor and take on Steven Borgens, then use the right of self-defense to be not – to be acquitted of his crime.
>
> And again, it must appear that it was so urgent and pressing that, in order to save his own life or to prevent his receiving great bodily harm, that the killing of the other was absolutely necessary. . . . And finally, a bare fear of death or great bodily injury is not sufficient to justify the use of a deadly weapon against another. . . .
>
> But the one key instruction that my colleague pointed out is Number 30. The right of self-defense is not available to an original aggressor.  He cannot claim self-defense in this case.  For him to claim self-defense, for this ironworker right here to claim self-defense, is you would have to believe that he came over there to [Kofed's house] truly innocent, without a loaded weapon, without carrying that weapon into the drive -- driveway, with no intent of causing any problems, never having caused any hostility, not only to Amy Beach or to Stephanie Roundtree to try to get these speakers back, that he was truly innocently there.

Exh. 28 at 83, 106-107.  Adkisson now argues that the prosecutor misstated the law when he argued that if Adkisson had "any hostility" toward anyone when he arrived at Kofed's house his self-defense claim must fail.

The Supreme Court of Nevada, pointing out that Adkisson failed to object, held that these and other statements by the prosecutor in closing were not improper:

> [T]he State commented on the law of self-defense stating that "a bare fear of death or great bodily injury is not sufficient to justify the use of deadly weapon against another."  Adkisson did not object to any of these portions of the State's closing argument . . . .
>
> Adkisson argues that the above portions of the State's closing argument constitute prosecutorial misconduct and improperly shifted the burden of proof to the defense by misstating the law.
>
> "As this court has stated, '[i]n order to preserve the issue of prosecutorial misconduct for appeal, the defendant must raise timely objections and seek corrective instructions.'"[FN15]  "[F]ailure to object precludes appellate review of the matter unless it rises to the level of plain error."[FN16]  "Prosecutorial misconduct can and will result in the reversal of convictions when it denies defendants their right to a fair trial."[FN17]
>
> [W]e conclude that the State's comments on the law of self-defense did not constitute plain error.  Specifically, the State's comment that "a bare fear of death or great bodily injury is not sufficient to justify the use of deadly weapon against another," was read directly from jury instruction no. 30.  Jury instruction no. 30 was taken, almost verbatim, from this court's sample instruction recited in *Runion v. State*.[FN20]  Accordingly, the State's comments were proper.[FN21]
>
> [FN15: *Riker v. State*, 111 Nev. 1316, 1328, 905 P.2d 706, 713 (1995) (alterations in the original) (quoting *Parker v. State*, 109 Nev. 383, 391, 849 P.2d 1062, 1067 (1993), cert. denied, 510 U.S. 1000 (1993)).]
>
> [FN16: *Anderson v. State*, 121 Nev._,_, 118 P.3d 184, 187 (2005).]
>
> [FN17: *Jones v. State*, 101 Nev. 573, 577, 707 P.2d 1128, 1131 (1985).]
>
> [FN20: 116 Nev. 1041, 1050-51, 13 P.3d 52, 58-59 (2000).]
>
> [FN21: We have considered Adkisson's other arguments surrounding the alleged prosecutorial misconduct and find them to be without merit.]

Exh. 46 at 7-9.

Adkisson does not argue that the jury instructions on self-defense were improper.  The main thrust of the prosecutor's closing was that Adkisson was the original aggressor, that he was angry that Borgens had driven his Mustang and was angry about the speakers.  The prosecutor

then stated that even if you believed Colacino—who is the only witness who testified that Borgens pushed her—that that did not justify Adkisson shooting Borgens in response. Exh. 28 at 111. Adkisson has not demonstrated that the Supreme Court of Nevada's decision that the prosecutor's arguments were not improper was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). I therefore deny federal habeas relief on ground 5(a).

**Ground 5(b)**

Adkisson asserts that the prosecution shifted the burden of proof and denigrated the defense when it argued that even though police had not collected shell casings or tested Borgens' hands for gunshot residue, that that evidence was "there for the defense to test too, if they want." ECF No. 28 at 42-43. The trial judge sustained the objection to this comment as misstating the burden of proof, but the comment was not stricken, nor was the jury instructed to disregard it.

The prosecutor argued in closing:

What more do you need? We're not -- What more evidence are you going to try to find out from a .9mm that was used when the defendant was trying to escape out of there? It's not going to – It's not the real murder weapon. So these are red herrings. And the gunshot residue, it's not going to reveal much of anything. He's already admitted to you he's the one who shot Steve Borgens. So this gunshot residue kit that hasn't been tested -- Although, Sergeant Manning says, hey, it's there for the defense to test too, if they want.

Exh. 28 at 105. Defense counsel immediately lodged an objection, which the court sustained. *Id*.

The Supreme Court of Nevada held that the State did not commit plain error and did not violate Adkisson's substantial rights:

"As this court has stated, '[i]n order to preserve the issue of prosecutorial misconduct for appeal, the defendant must raise timely objections and seek corrective instructions.'"[FN15] "[F]ailure to object precludes appellate review of the matter unless it rises to the level of plain error."[FN16] "Prosecutorial

misconduct can and will result in the reversal of convictions when it denies
defendants their right to a fair trial."[FN17]

We conclude that the State's comments that the additional shell casings found
were "red herrings," and that in order to believe Colacino the jury would have to
believe that all of the other witnesses were "just pure liars," did not constitute
plain error. . . . [T]he evidence of guilt was overwhelming and therefore the
comment did not affect Adkisson's substantial rights.[FN19]

[FN14: Consequently, we decline to address the State's comment that the
defense could have tested the additional shell casings as well. *See Owens v. State*,
96 Nev. 880, 885, 620 P.2d 1236, 1240 (1980) (where an objection is sustained
and the jury admonished, this court presumes the admonition was followed by the
jury).]

[FN15: *Riker v. State*, 111 Nev. 1316, 1328, 905 P.2d 706, 713 (1995)
(alterations in the original) (quoting *Parker v. State*, 109 Nev. 383, 391, 849 P.2d
1062, 1067 (1993), cert. denied, 510 U.S. 1000 (1993)).]

[FN16: *Anderson v. State*, 121 Nev. 511, 516, 118 P.3d 184, 187 (2005).]

[FN17: *Jones v. State*, 101 Nev. 573, 577, 707 P.2d 1128, 1131 (1985).]

[FN19: *Id*. at 38, 39 P.3d at 118 (stating that in a plain error setting, the
stronger the State's case is the less likely a prosecutor's misconduct will be
considered prejudicial thereby affecting the defendant's substantial rights).]

Exh. 46 at 7-9.

Defense counsel objected to the prosecutor stating that the defense could have tested the

shell casings too as improper burden shifting.  The trial judge agreed and sustained the objection.

The judge did not give any additional admonishment.  But the main issue for the jury to

determine was whether to credit the three eyewitnesses who testified that Borgens was unarmed

and was not a lethal threat to Adkisson when Adkisson shot him, or to believe Adkisson's

girlfriend Colacino, who was pregnant at the time with Adkisson's child and who gave birth to

the baby right before the trial.  The 911 call, the police testimony, and video of the police stand-

off and arrest of Adkisson supported the State's theory of the case.  Adkisson has not shown that

the Supreme Court of Nevada's decision that none of the prosecutor's comments constituted

plain error was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  Federal ground 5(b) is denied.

**Ground 6**

Finally, Adkisson argues that the cumulative effect of errors at trial and the ineffective assistance of counsel violated his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial, due process, to present a defense, and to be proven guilty beyond a reasonable doubt. ECF No. 28 at 43-45.

"The Supreme Court has clearly established that the combined effect of multiple trial errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)).  The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal. *Chambers*, 410 U.S. at 290 n.3.  "[W]here the combined effect of individually harmless errors renders a criminal defense 'far less persuasive than it might [otherwise] have been,' the resulting conviction violates due process." *Parle*, 505 F.3d at 927.

The Supreme Court of Nevada explained that Adkisson's assignments of error on appeal lacked merit, and therefore his cumulative effect argument lacked merit. Exh. 46 at 9-10.  On postconviction review, the Supreme Court of Nevada held that there was one *Petrocelli* error for which Adkisson failed to demonstrate prejudice; thus there were no errors to cumulate. Exh. 117 at 8.  Adkisson has not shown that the Supreme Court of Nevada's rejection of his cumulative error claim was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  Federal habeas relief is denied as to ground 6.

### VII. Certificate of Appealability

This is a final order adverse to Adkisson.  As such, Rule 11 of the Rules Governing Section 2254 Cases requires me to issue or deny a certificate of appealability (COA).  Accordingly, I have *sua sponte* evaluated Adkisson's claims for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

A COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

Having reviewed my determinations and rulings in adjudicating Adkisson's petition, I find that none of those rulings meets the *Slack* standard.  I therefore decline to issue a certificate of appealability.

### VIII. Conclusion

I THEREFORE ORDER that the petition for a writ of habeas corpus under 28 U.S.C. § 2254 [ECF No. 28] is denied.

I FURTHER ORDER that a certificate of appealability is denied.

I FURTHER ORDER the Clerk of the Court to substitute Nethanjah Breitenbach for respondent D.W. Neven.

1    I FURTHER ORDER that petitioner's motion for reconsideration [ECF No. 126] is

2 denied.

3    I FURTHER ORDER the Clerk of Court to enter judgment accordingly and close this

4 case.

5    Dated: March 28, 2023

6    _____

7    U.S. District Judge Andrew P. Gordon